**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CINNAMON MCMILLIAN, *administrator ad prosequendum* for the estate of JOSHUA MCMILLIAN,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF NEW JERSEY, *et al.*,<br><br>Defendants. | Civil Action No. 21-20600 (SDW)(JRA)<br><br>**OPINION**<br><br>July 5, 2023 |

**WIGENTON**, District Judge.

Before this Court is Defendants Doctor Gordon Presley ("Dr. Presley"), Doctor Manuel Garcia ("Dr. Garcia"), and Doctor Anasuya Salem's ("Dr. Salem," and together with Drs. Presley and Garcia, the "Medical Defendants") Partial Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). (D.E. 48.) In accordance with Rule 12(d), this Court converted the Medical Defendants' Partial Motion for Judgment on the Pleadings into a partial motion for summary judgment under Rule 56. (D.E. 66.) Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendants' partial motion for summary judgment (D.E. 48, 71 ("Partial Motion for Summary Judgment")) is **GRANTED**.

1

I.      **BACKGROUND**[1]

On January 2, 2020, Joshua McMillian ("Decedent") committed suicide while in the custody of the New Jersey State Department of Corrections ("DOC") at Northern State Prison ("NSP") in Essex County, New Jersey. (*Id.* ¶¶ 2, 39–40.) Decedent had been in custody since in or around October 2016, serving a term of imprisonment not to exceed five years. (*Id.* ¶ 11.)

Throughout his incarceration, Decedent suffered from mental health issues. (*See generally id.*) On October 21, 2016, Decedent first expressed a desire to kill himself after he was found kneeling, praying on the floor, and hearing voices. (*Id.* ¶ 13.) Following that episode, Decedent was diagnosed with paranoid schizophrenia and placed on constant watch for several days. (*Id.* ¶ 14.) For the next three years, Decedent experienced various difficulties associated with his diagnosis, including hallucinations, delusions, "misbehavior incidents," irrational and paranoid thinking, and suicidal thoughts. (*Id.* ¶¶ 15–39.) As a result, DOC medical staff frequently placed Decedent on heightened or constant watch and prescribed him with multiple antipsychotic medications—first, Risperdal and, later, Abilify. (*Id.* ¶¶ 15–26.) Although Decedent was not compliant with his Risperdal prescription, he complied, at least for a time, with his Abilify prescription and reported that it was helping him. (*Id.* ¶¶ 15, 20–22, 25–26.) On October 28, 2019, after months of Decedent's "repeated noncompliance" with his Abilify prescription, Dr. Garcia discontinued its use. (*Id.* ¶¶ 25–26.) According to the Complaint, DOC medical staff, including the Medical Defendants, "were aware that without antipsychotic medications [Decedent] was likely to experience increased paranoia and delusions." (*Id.* ¶ 27.)

The Complaint alleges that, over the ensuing months, the Medical Defendants provided Decedent with inadequate care, which ultimately led to his death. First, the Complaint asserts that,

---

[1] The background facts derive largely from the Complaint (D.E. 1-2 ("Complaint")), as only limited discovery has occurred.

2

on November 2, 2019, Dr. Presley noted that Decedent would be monitored weekly; however, the next time Dr. Presley reportedly saw Decedent was November 26, 2019. (*Id.* ¶¶ 28–29.) Then, on December 8, 2019, Decedent purportedly expressed suicidal thoughts and was "brought to the stabilization unit on constant watch." (*Id.* ¶ 30.) The next day, though, Dr. Salem allegedly discharged Decedent from the stabilization unit. (*Id.* ¶ 31.) The Complaint states that Decedent received no further medical treatment except for two "interviews" by Dr. Presley on December 10 and 23, 2019, during which Decedent expressed that his paranoid-schizophrenia symptoms had not subsided. (*Id.* ¶¶ 32–33, 36.) After the December 23 interview, Dr. Presley indicated that "psychopharmacological intervention w[ould] be discussed with [the] unit psychiatrist." (*Id.* ¶ 33.) Between then and January 2, 2020, no such intervention occurred. (*Id.* ¶¶ 34–35.) On January 2, 2020, following a series of alleged missteps by officers at NSP, Decedent committed suicide in his cell. (*Id.* ¶¶ 41–52.)

## II.     PROCEDURAL HISTORY

On or about November 2, 2020, Cinnamon McMillian ("Plaintiff") was appointed the administrator *ad prosequendum* of Decedent's estate. (*Id.* ¶ 7.) Over a year later, on December 3, 2021, Plaintiff filed the Complaint in New Jersey state court, alleging causes of action under 42 U.S.C. § 1983; the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2; and New Jersey common law. (*See generally id.*) On December 20, 2021, Defendants State of New Jersey, Officer E. Munoz, Officer E. Sambour, and Officer R. Fernandez[2] timely removed the matter to this Court. (D.E. 1.) Counsel for the Medical Defendants filed a notice of appearance on March 29, 2022, (D.E. 21), and one month later, they requested—with consent of all parties—an extension to answer or otherwise respond to the Complaint, (D.E. 22). After this Court granted their request,

---

[2] On February 4, 2022, those same Defendants moved to dismiss the Complaint. (D.E. 16.) This Court granted in part and denied in part the motion to dismiss as set forth in the order dated August 17, 2022. (D.E. 31.)

the Medical Defendants filed an Answer to the Complaint on May 27, 2022. (D.E. 23, 24.) Therein, the Medical Defendants, *inter alia*, raised several defenses, including those available under the New Jersey Tort Claims Act, N.J. Stat. Ann. §§ 59:1-1 *et seq.* ("NJTCA"), and the Affidavit of Merit Statute, N.J. Stat. Ann. §§ 2A:53A–26 to –29 ("AOM Statute"). (D.E. 24 at 11–12.) On January 18, 2023, having not received a notice of tort claim pursuant to the NJTCA or an AOM pursuant to the AOM Statute, the Medical Defendants filed the Partial Motion for Judgment on the Pleadings. (D.E. 48.) On June 7, 2023, this Court converted that motion into a motion for summary judgment and, in accordance with Rule 12(d), permitted the parties an opportunity to "submit supplemental briefing regarding any additional materials relevant to" the Partial Motion for Summary Judgment.[3] (D.E. 66.) The parties timely completed supplemental briefing. (D.E. 71, 72.)

### III.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact

---

[3] This Court has discretion to convert a motion for judgment on the pleadings into one for summary judgment and thereafter consider matters outside the pleadings. *Glob. Naps, Inc. v. Bell Atl.-N.J., Inc.*, 287 F. Supp. 2d 532, 538 n.8 (D.N.J. 2003) ("[T]his Court has the discretion to decide whether to convert a motion for judgment on the pleading[s] to one for summary judgment."); *see also Jones v. Brown*, 461 F.3d 353, 357 n.5 (3d Cir. 2006) (explaining that a district court's decision to convert cross-motions for judgment on the pleadings into cross-motions for summary judgment would be reviewed for abuse of discretion). In converting a motion under Rule 12 to one for summary judgment, the district court must "provid[e] the parties at least ten days' notice and opportunity to submit evidence of record to support or oppose summary judgment." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195–96 (3d Cir. 2019) (citing *Rose v. Bartle*, 871 F.2d 331, 340 (3d Cir. 1989)).

"might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To prevail on a motion for summary judgment, the moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must "set forth specific facts showing the existence of . . . an issue for trial." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (citing FED. R. CIV. P. 56(e)). The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record [that] supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004) (citing *Celotex Corp.*, 477 U.S. at 322–23)). The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002) (citing *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998)). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23.

In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his [or her] favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). The court's role is "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## IV. DISCUSSION[4]

### A. The AOM Statute

New Jersey's AOM Statute provides:

> In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside professional or occupational standards or treatment practice. The court may grant no more than one additional

---

[4] Plaintiff objects to this Court's Order directing the parties to submit simultaneous supplemental briefs and "file any additional materials relevant to Plaintiff's compliance or noncompliance with the notice requirements" of the two New Jersey statutes. (D.E. 72 at 3–5.) Plaintiff's objection is misguided. The NJTCA is the statutory scheme through which the New Jersey Legislature effected a limited waiver of sovereign immunity, and compliance with its "notice requirements [is] an important component of the statutory scheme." *McDade v. Siazon*, 32 A.3d 1122, 1129 (N.J. 2011) (citing N.J. Stat. Ann. § 69:8–8 and –9). In addition, the purpose of the AOM Statute is to filter out meritless litigation at an early stage, and noncompliance with that statute results in dismissal with prejudice. *Couri v. Gardner*, 801 A.2d 1134, 1137 (N.J. 2002) ("[T]he overarching purpose of the [AOM] statute is 'to require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation." (internal citation omitted)); *see also Ferreira v. Rancocas Orthopedic Assocs.*, 836 A.2d 779, 782 (N.J. 2003) ("[T]he plaintiff's failure to serve the [AOM] . . . is considered tantamount to the failure to state a cause of action, subjecting the complaint to dismissal with prejudice. (citations omitted)). With those legislative schemes in mind, this Court converted the Medical Defendants' motion for judgment on the pleadings into a motion for summary judgment so that it could consider limited matters beyond the pleadings— namely, whether Plaintiff timely and properly served a notice of tort claims and an AOM. Contrary to Plaintiff's objection, neither additional briefing nor extensive discovery was required for Plaintiff to comply with this Order. Indeed, the parties had previously fully briefed the issues, (D.E. 48, 59, 60), and the relevant conduct underlying the instant Motion should have been completed long ago. The purpose of the supplemental briefing was simply to afford the parties another opportunity to provide this Court with information and materials relevant to Plaintiff's compliance, noncompliance, or explanations for her noncompliance with the relevant statutes.

> period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

N.J. Stat. Ann. § 2A:53A–27. The "overall purpose of the statute is to require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation." *Couri*, 801 A.2d at 1137 (internal quotation marks and citation omitted). Accordingly, "[t]he statute imposes a set of procedural requirements" on plaintiffs asserting a claim for professional malpractice. *Ferreira*, 836 A.2d at 782. First, the plaintiff must obtain an affidavit from a licensed expert attesting to the reasonable likelihood of professional negligence, *id.*; and second, the plaintiff must provide the AOM to the defendant "within sixty days of the filing of the answer or, for good cause shown, within an additional sixty-day period," *id.* (citing N.J. Stat. Ann. § 2A:53A–27). A plaintiff's failure to timely serve an AOM "is considered tantamount to the failure to state a cause of action, subjecting the complaint to dismissal with prejudice." *Id.*; *see also Knorr v. Smeal*, 836 A.2d 794, 798 (N.J. 2003) ("[A] plaintiff must file an affidavit of merit within 120 days of the filing of the answer or face dismissal of the complaint with prejudice, absent some equitable justification." (citing *Tischer v. Watts*, 827 A.2d 1036, 1038 (N.J. 2003))).

The Medical Defendants contend that, because Plaintiff failed to serve an AOM, her claims against them must be dismissed. (D.E. 48-1 at 10–13.) Conceding noncompliance, Plaintiff raises several arguments that she believes excuse her nonperformance. This Court considers each of Plaintiff's arguments and finds them unpersuasive.

1. Common Knowledge Exception

To determine whether the AOM Statute applies to a particular claim, a court must consider:

> (1) whether the action is for "damages for personal injuries, wrongful death or property damage" (nature of injury); (2) whether the action is for "malpractice or negligence" (cause of action); and

7

> (3) whether the "care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint [] fell outside acceptable professional or occupational standards or treatment practices."

*Couri*, 801 A.2d at 1137–38 (quoting N.J. Stat. Ann. § 2A:53A–27).  Plaintiff does not dispute any of those elements; rather, she insists that the "common knowledge" exception excuses her from having to comply with the AOM Statute.  (D.E. 59 at 29–32.)  Plaintiff's argument is unsupported.

The common knowledge exception applies in "exceptionally rare cases"[5] in which "an expert is not needed to demonstrate that a defendant[-]professional breached some duty of care 'where the carelessness of the defendant is readily apparent to anyone of average intelligence.'" *Cowley v. Virtue Health Sys.*, 230 A.3d 265, 274 (N.J. 2020) (quoting *Rosenberg v. Cahill*, 492 A.2d 371, 374–75 (N.J. 1985)).  The exception excuses the AOM requirement "<u>only</u> where it is apparent that 'the issue of negligence is not related to technical matters peculiarly within the knowledge of [the licensed] practitioner[].'"  *Id.* (alterations in original) (quoting *Sanzari v. Rosenfeld*, 167 A.2d 625 (N.J. 1961)); *see also Hubbard*, 774 A.2d at 500 ("If jurors, using ordinary understanding and experience and without the assistance of an expert, can determine whether a defendant has been negligent, the threshold of merit should be readily apparent from a reading of plaintiff's complaint.").  "Because of the innate complexities of medical malpractice actions, such issues do not usually fall within the common knowledge of an average juror." *Cowley*, 230 A.3d at 275 (quoting *Rosenberg*, 492 A.2d at 374)).  Courts, however, have applied the common knowledge exception in medical malpractice cases for the following conduct:  pulling

---

[5] The Supreme Court of New Jersey has explained that the exception is to be construed "narrowly in order to avoid non-compliance with the [AOM] statute."  *Hubbard ex rel. Hubbard v. Reed*, 774 A.2d 495, 501 (N.J. 2001).

the wrong tooth from a patient's mouth, carelessly misreading two pregnancy tests, and connecting a gas line rather than a fluid line to a patient's uterus.  *Id.* (collecting cases).

In *Cowley v. Virtua Health System*, the Supreme Court of New Jersey explained:

> [I]n the hierarchical setting of a multi-disciplinary medical team providing care to a hospitalized patient, plaintiff alleges that the overnight duty nurses charged with monitoring her as the hospitalized patient were negligent in that case.  To assess a deviation in the standard of care in such a setting, one must know the procedures, protocols, and scope of duties of the licensed professional nurses in such circumstances.  An expert is required for that explanation.  Such information is outside of the realm of common knowledge.

230 A.3d at 276.  Similarly, here, an expert is required to assess the Medical Defendants' procedures, protocols, and scope of duties in monitoring and providing care for Decedent.  To be sure, the Complaint contains a history of Decedent's medical treatment from October 21, 2016, until his death on January 2, 2020, including, *inter alia*, the following care provided by medical staff at NSP:  their numerous decisions to place Decedent on heightened watch; their subsequent decisions to keep Decedent on heightened watch or discharge him therefrom; their decisions to prescribe antipsychotic drugs—Risperdal and Abilify—to Decedent and to thereafter discontinue those prescriptions due to Decedent's "repeated noncompliance"; their alleged delays in providing certain treatments; and their practice of providing care to Decedent "'cell-side' or otherwise within his correctional housing units."  (*See generally* D.E. 1-2.)  The Complaint, then, expressly suggests an alternative course of treatment should have been provided to Decedent.  (*Id.* ¶ 71.)  Specifically, Plaintiff contends that the Medical Defendants should have provided Decedent with "private [mental health counseling] sessions in a clinical environment," "psychotropic medicines," "suicide prevention techniques such as direct observation, and placement in a suicide proof cell until

9

underlying mental health issues had resolved to the point where he could be safely housed in a general population cell." (*Id.*)

Plaintiff is not simply pointing to one doctor's obvious deviation from the standard of care in one instance; instead, she is challenging numerous, complex decisions by a team of doctors providing several forms of treatment to Decedent over an extended period. It is clear that "[t]he medical issue presented requires expert medical proofs concerning the requisite standard of care in these settings." *Cowley* 230 A.3d at 277. Accordingly, the common knowledge exception does not apply.

    2. <u>Laches and Estoppel</u>

Plaintiff also contends that the doctrines of laches and equitable estoppel should bar the Medical Defendants from asserting a defense under the AOM Statute. (D.E. 59 at 27–29.)

The Supreme Court of New Jersey has recognized that the doctrines of equitable estoppel and laches may bar a defendant from asserting a defense under the AOM Statute. *Knorr*, 836 A.2d at 801. "[T]o establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." *Id.* at 799. In a similar vein, the doctrine of laches may be "invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party." *Id.* at 800. "Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned." *Id.* "The key factors to be considered in deciding whether to apply the doctrine [of laches] are the length of the delay, the reasons for the delay, and the 'changing

conditions of either or both parties during the delay.'" *Id.* "The core equitable concern in applying laches is whether a party has been harmed by the delay." *Id.*

Here, Plaintiff argues that the Medical Defendants' withholding medical documents and delay in filing the instant Motion should bar them from asserting a defense under the AOM Statute. (D.E. 59 at 27–29.) Plaintiff's contentions miss the mark. First, although Plaintiff is correct that the AOM Statute does not shield from liability medical malpractice defendants who withhold documents that the plaintiff's "expert would need to prepare the affidavit," *Ferreira*, 836 A.2d at 782 (citing *Barreiro v. Morais*, 723 A.2d 1244, 1248 (N.J. Super. Ct. App. Div. 1999)), her own inaction undermines her position. On May 27, 2022, the Medical Defendants filed their Answer in which they specifically raised the AOM Statute as an affirmative defense. (D.E. 24 at 12.) Plaintiff, then, was required to provide the AOM by no later than September 24, 2022. N.J. Stat. Ann. § 2A:53A–27. Plaintiff does not argue that she requested any documents from the Medical Defendants during that time, nor does she allege any conduct by the Medical Defendants that induced her to believe that they had abandoned their affirmative defense under the AOM Statute. Moreover, even if the Medical Defendants had withheld documents, Plaintiff fails to explain why the 3,000 medical documents from NSP that she had in her possession were "insufficient to comply with the [AOM] statute, especially considering that the [AOM] requirement 'is not concerned with the ability to prove the allegation contained in the complaint.'" *Stephens v. City of Englewood*, No. 14-5362, 2015 WL 6737022, at *5 (D.N.J. Nov. 3, 2015) (quoting *Hubbard*, 774 A.2d at 499). Simply put, Plaintiff's inaction—rather than actions by the Medical Defendants—caused her noncompliance with the AOM Statute.

Second, Plaintiff has failed to show that the Medical Defendants engaged in inexcusable delay when they filed the instant Motion less than four months after the AOM deadline lapsed. As

11

this Court has previously explained, even an 11-month delay does not prejudice a plaintiff "in any meaningful way," where, as here, "only limited paper discovery ha[s] been exchanged and no depositions have been taken." *Cornerstone Staffing Sols., Inc. v. Weber, Shapiro & Co.*, No. 18-3441, 2019 WL 6318302, at *4 (D.N.J. Nov. 26, 2019), *aff'd*, 842 F. App'x 732 (3d Cir. 2021). Therefore, neither laches nor equitable estoppel precludes the Medical Defendants' Motion.

    3.  Constitutionality and *Erie*[6]

Plaintiff next contends that, absent the "procedural mechanisms created by the New Jersey Courts," the AOM Statute is unconstitutional. (D.E. 59 at 32–36.) Plaintiff's argument runs counter to longstanding precedent in the Third Circuit and the Supreme Court of New Jersey.[7]

In *Chamberlain v. Giampapa*, the Third Circuit applied the principles under *Erie* and squarely held that New Jersey's AOM Statute "is substantive state law that must be applied by federal courts." 210 F.3d 154, 161 (3d Cir. 2000). Although Plaintiff acknowledges the Third Circuit's holding in *Chamberlain*, she argues that the "decision was made analyzing the original version of the [AOM Statute] that existed prior to its recent makeover that began with *Ferreira* in 2003." (D.E. 59 at 36.) Plaintiff seemingly ignores the 2012 decision in *Nuveen Municipal Trust ex rel. Nuveen High Yield Municipal Bond Fund v. Withumsmith Brown, P.C.*, wherein the Third Circuit reaffirmed *Chamberlain* and unequivocally stated that the prophylactic protections established by the Supreme Court of New Jersey "are procedural" and thus are not required in federal court. 692 F.3d 283, 305 (3d Cir. 2012). Notably, in reaching that decision, the Third Circuit explained that "plaintiffs (and their attorneys) are required to know the law. They should

---

[6] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[7] Notably, in support of her argument, Plaintiff does not point to any precedent—binding or otherwise—which holds that the AOM Statute is unconstitutional or violative of *Erie*.

12

not need to be reminded of the [AOM] requirement . . . ." *Id.* at 304.  The Supreme Court of New Jersey similarly recognizes that "parties are presumed to know the law and are obliged to follow it," and that "an attorney's inadvertence in failing to timely file an [AOM] will generally result in dismissal with prejudice." *Paragon Contractors, Inc. v. Peachtree Condo. Ass'n*, 997 A.2d 982, 986–87 (N.J. 2010).  Against the backdrop of that precedent, this Court declines to find merit in Plaintiff's argument that her (or her counsel's) failure to follow the AOM Statute's unambiguous directive is unconstitutional.

## V.     CONCLUSION[8]

For the reasons set forth above, Defendants' Partial Motion for Summary Judgment is **GRANTED**.  An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:     Parties
        Jose R. Almonte, U.S.M.J.

---

[8] Because Plaintiff's failure to comply with the AOM Statute warrants dismissal of Counts Three and Four, this Court need not address the Medical Defendants' NJTCA argument.