**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CINNAMON MCMILLIAN,<br>Plaintiff,<br>v.<br>THE STATE OF NEW JERSEY, *et al.*,<br>Defendants. | Civil Action No: 21-20600 (SDW) (JRA)<br>**OPINION**<br>September 23, 2026 |

**WIGENTON**, District Judge.

Before this Court are Defendants the State of New Jersey, Officers Emmanuel Munoz, Eder Sambour, and Robert Fernandez's (collectively, "State Defendants") Motion for Summary Judgment (D.E. 251 ("MSJ")) and Doctors Gordon Presley, Manuel Garcia, and Anasuya Salem's (collectively, "Medical Defendants") Motion for Summary Judgment (D.E. 248), pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. § 1441. Venue is proper pursuant to 28 U.S.C. § 1391. This Opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, State Defendants' MSJ and Medical Defendants' MSJ are both **GRANTED**.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

[1] Facts cited in this Opinion are drawn from the Complaint (D.E. 1-2), State Defendants' Statement of Material Facts (D.E. 251-3), Medical Defendants' Statement of Undisputed Material Facts (D.E. 248-2), Plaintiff's Response and Counterstatement to the State Defendants' Statement of Material Facts (D.E. 267-1), and Plaintiff's Response and Counterstatement to the Medical Defendants' Statement of Material Facts (D.E. 265-1.)

This case stems from the January 2, 2020 suicide of Joshua McMillian ("Mr. McMillian") while in the custody of the New Jersey Department of Corrections ("DOC") at Northern State Prison ("NSP") in Newark, New Jersey. Although the parties do not dispute the fact or location of Mr. McMillian's death, the central factual disputes concern the actions of the correctional officers and medical providers responsible for monitoring and treating him during his incarceration.

A. Events Prior to January 2, 2020 and Mr. McMillian's Medical Care

On October 16, 2016, Mr. McMillian was convicted and sentenced to serve up to five years in DOC custody. (D.E. 248-2 ¶ 11.) Five days later, on October 21, 2016, he underwent a psychiatric evaluation after making a comment suggesting indifference to living. (*Id.* ¶ 13.) He was assessed as paranoid with marked religiosity, and the treating physician noted that he should be placed on the special needs roster, put on suicide watch, and transferred to the Stabilization Unit ("SU") for further observation. (*Id.* ¶ 14.) The SU is a specialized unit for inmates engaging in behavior harmful to themselves or others. (*Id.* ¶ 5.) Through the remainder of 2016 and into early 2017, Mr. McMillian underwent multiple psychological tests, which suggested antisocial character pathology rather than a psychotic disorder. (*Id.* ¶¶ 19–38.) By January 24, 2017, he was diagnosed with "Unspecified Personality Disorder". (*Id.* ¶ 31.)

Throughout 2017 and early 2018, Mr. McMillian cycled through multiple facilities and underwent numerous psychological tests. (*Id.* ¶¶ 40–50.) The prevailing view was that he had a personality disorder and did not appear to be psychotic. (*Id.*) On June 19, 2018, Dr. Manuel Garcia ("Dr. Garcia"), a psychiatrist, conducted a psychiatric assessment and concluded that Mr. McMillian appeared to suffer from a paranoid disorder. (*Id.* ¶¶ 51–52.) On July 6, 2018, Dr. Garcia recommended the medication Celexa, which Mr. McMillian agreed to take once released

from the Administrative Segregation Unit ("AdSeg"), where inmates are housed after receiving disciplinary charges while incarcerated. (*Id.* ¶¶ 9, 51–53.) During the remainder of 2018, Mr. McMillian experienced repeated conflicts with his cellmate, cycled in and out of the SU, and underwent additional psychiatric evaluations—most notably two evaluations by Dr. Anasuya Salem ("Dr. Salem") in November 2018. (*See id.* ¶¶ 55–69.) On both occasions, Dr. Salem found him stable and released from the SU. (*Id.* ¶¶ 59, 62.)

Psychological evaluations in early 2019 continued to diagnose Mr. McMillian with Paranoid Personality Disorder ("PPD") and concluded that he did not meet the criteria for forced medication. (*Id.* ¶¶ 73–76.) On February 11, 2019, Dr. Salem noted that Mr. McMillian was not suicidal or homicidal at the time. (*Id.* ¶ 77.) On May 9, 2019, Dr. Garcia documented that Mr. McMillian was experiencing paranoia that had contributed to multiple incidents of misbehavior and prescribed the antipsychotic medication Abilify to help prevent paranoid reactions from escalating into violence. (*Id.* ¶¶ 93–95.) Although Abilify initially appeared to help, Mr. McMillian later became noncompliant, and Dr. Garcia noted that noncompliance. (*Id.* ¶¶ 97, 116.) On July 10, 2019, Dr. Salem released Mr. McMillian from the SU after one day, noting that he was psychologically stable. (*Id.* ¶ 101.)

From July through October 2019, Mr. McMillian repeatedly refused to take Abilify despite multiple warnings from Dr. Garcia. (*Id.* ¶¶ 135–138.) On October 28, 2019, Dr. Garcia discontinued the prescription due to Mr. McMillian's continued noncompliance. (*Id.* ¶¶ 138–139.) Under the applicable protocol, after an inmate has been off a medication for four weeks, psychiatrists cycle out patients who are not actively taking medications. (*Id.* ¶ 140.)

On December 8, 2019, Mr. McMillian reported suicidal thoughts related to family issues. (*Id.* ¶ 146.) The next day, Dr. Salem found no active depression, anxiety, or psychosis and cleared

him from the SU, making December 9, 2019 Mr. McMillian's last day in the SU. (*Id.* ¶¶ 147–150.) On December 10 and 23, 2019, Dr. Gordon Presley ("Dr. Presley"), a psychologist, noted interpersonal issues, ongoing paranoia and irrational thinking consistent with Mr. McMillian's PPD diagnosis. (*Id.* ¶¶ 154–155.) Although Dr. Presley testified that he did not observe any deterioration in Mr. McMillian's functioning during these appointments, he also noted that since Mr. McMillian was not taking any psychotropic medications at the time, he intended to discuss psychopharmacological intervention with the unit psychiatrist, Dr. Garcia. (*Id.* ¶¶ 155–161.) Dr. Presley concedes that no such intervention occurred. (D.E. 265-1 ¶¶ 203, 207; D.E. 265-5 at 25.)

B. <u>The Events of January 2, 2020</u>

On January 2, 2020, Mr. McMillian died of a reported suicide. (D.E. 251-3 ¶ 1.) On that day, he was housed in cell 225 in the 4-Wing housing unit at NSP. (*Id.* ¶ 6.) At approximately 6:27 p.m., officers were alerted by Mr. McMillian's cellmate that Mr. McMillian was attempting to hang himself from a light fixture. (*Id.* ¶ 7.) Officers Munoz, Sambour and Fernandez (collectively, "Officer Defendants") were working as corrections officers at NSP and were present in the 4-Wing housing unit at the time of the incident. (Compl. ¶ 9.) Officers immediately radioed a Code 66 (attempted suicide) emergency to notify the staff of the incident. (D.E. 251-3 ¶ 8; D.E. 248-2 ¶ 162.) Officers promptly responded with a defibrillator, cut Mr. McMillian down, and once he was on the ground, performed CPR until medical staff arrived. (D.E. 251-3 ¶¶ 10–11.) Mr. McMillian was pronounced dead at 7:29 p.m. (D.E. 248-2 ¶ 162.)

C. <u>Procedural History</u>

On December 3, 2021, Plaintiff Cinnamon McMillian, Mr. McMillian's sister and the administrator of his estate, filed this four-count Complaint in the Superior Court of New Jersey, Essex County. (*See* Compl.) On December 20, 2021, the Officer Defendants removed this action

to federal court and moved to dismiss the Complaint on February 4, 2022. (*See* D.E. 1, 16.) On August 17, 2022, following oral argument, this Court partially granted the Officer Defendants' Motion to Dismiss, dismissing with prejudice Counts I and II against the State of New Jersey, and denying the Motion without prejudice as to the remaining claims against the Officer Defendants. (D.E. 31.)

On May 27, 2022, the Medical Defendants answered the Complaint, and asserted several defenses, including those under the New Jersey Tort Claims Act ("NJTCA") and the Affidavit of Merit Statute ("AOM Statute"). (D.E. 24.) The Officer Defendants answered on September 30, 2022. (D.E. 37.) On January 18, 2023, after Plaintiff did not provide a notice of tort claim under the NJTCA or an affidavit of merit under the AOM Statute, the Medical Defendants moved in part for judgment on the pleadings, which this Court converted to one for summary judgment under Rule 56. (D.E. 48.) On July 5, 2023, this Court granted the Medical Defendants' partial motion for summary judgment and dismissed the medical malpractice and negligence claims (Counts III and VI) against them. (D.E. 73, 74.) After discovery concluded, the State and Medical Defendants moved for summary judgment on all remaining claims. (D.E. 248, 251.) The Motions were timely briefed and are now ripe for adjudication.

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original). A fact is only "material" for purposes of a summary judgment motion if a

dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this initial burden, the burden then shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. In considering a motion for summary judgment, this Court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255).

## III. DISCUSSION

All Defendants contend that the evidence is insufficient to satisfy the applicable legal standards, and that there are no genuine disputes of material fact for a jury to decide. The State Defendants argue that the deliberate indifference claims fail as a matter of law because the officers are entitled to qualified immunity, and that the negligence claims also fail because the NJTCA immunizes public employees whose conduct was objectively reasonable. (D.E. 251-4 at 14–42.) They further argue that even absent NJTCA immunity, the negligence claim fails for lack of expert testimony to establish a breach of duty in the correctional setting, leaving a potential jury without a basis to determine whether the officers deviated from the applicable standard of care in a prison environment. (*Id.* at 11–12.)

The Medical Defendants challenge the two remaining claims against them—the constitutional violations—arguing that the record contains no facts showing they recklessly disregarded a substantial risk of serious harm to Mr. McMillian and therefore the claims do not meet the demanding deliberate indifference standard. (D.E. 248-1 at 7–8.)

A. State Defendants' MSJ

i. Counts I and II: § 1983 and NJCRA Claims

Congress enacted 42 U.S.C. § 1983 to provide a vehicle for plaintiffs to obtain relief for constitutional violations. *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011) (quoting 42 U.S.C. § 1983)). To state a claim under § 1983, a plaintiff must allege that: (1) the defendant acted under color of law, and (2) violated the plaintiff's rights under federal constitutional or statutory law. *Id.* (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993)).

When the defendant is a government official, qualified immunity may apply, shielding government officials from individual liability for civil damages on § 1983 claims. *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 431 (D.N.J. 2011). Qualified immunity applies unless the

plaintiff can demonstrate: (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). Courts may address either prong first, but failure to satisfy either prong entitles the officer to qualified immunity. *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).

Count I alleges that Officers Munoz, Sambour, and Fernandez are liable under § 1983 for violating Mr. McMillian's rights under the Eighth and Fourteenth Amendments[2]. (Compl. ¶ 55.) Plaintiff asserts that the officers had actual knowledge of Mr. McMillian's serious medical and mental health needs and were deliberately indifferent to those needs. (*Id.* ¶ 56.) Specifically, Plaintiff alleges that although the officers were aware of the risk that Mr. McMillian would attempt suicide, they failed to monitor him with sufficient frequency to prevent him from harming himself. (*Id.* ¶ 59.) The Officer Defendants respond that they are entitled to qualified immunity because Plaintiff cannot show either that a constitutional right was violated or that any such right was "clearly established" at the time of the alleged conduct. (D.E. 251-4 at 14–36.) The parties do not dispute that all three officers acted under color of law at all relevant times. (*Id.* at 15.)

a. Whether the Right is "Clearly Established"

As an initial matter, the precise "right" at issue is not entirely clear because Plaintiff advances several theories under the § 1983 claim. However, at its core, Plaintiff alleges that Officer Defendants violated Mr. McMillian's clearly established right to be free from deliberate indifference to a known, particular vulnerability to suicide—given his high-risk status and longstanding mental health history. (Compl. ¶¶ 56, 59.) Because the Third Circuit recognizes a clearly established right against deliberate indifference to a detainee's known, specific

[2] No statutory violation was alleged.

vulnerability to suicide, the second prong of the qualified immunity analysis is satisfied. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) ("*Colburn II*"); *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005). The remaining question is whether Officer Defendants violated that right.

b. Whether Officer Defendants Acted with Deliberate Indifference to Mr. McMillian's Known Vulnerability to Suicide

The Eighth Amendment, applicable to the States through the Fourteenth Amendment, prohibits cruel and unusual punishment. U.S. CONST. Amend, VIII. Because § 1983 liability generally requires an affirmative act rather than a mere omission, the Eighth Amendment is implicated where a correctional officer is deliberately indifferent to a *known* risk of serious harm or cases where the officer is aware of, yet deliberately disregards, an excessive risk to inmate safety. *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 283 n.7 (3d Cir. 2006); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). *Farmer* adopted a subjective standard for deliberate indifference, turning on the particular officer's actual, subjective knowledge of the risk. *Farmer*, 511 U.S. at 837.

The Third Circuit applies a three-part framework specifically for prison suicide claims that operates alongside but is not identical to the *Farmer* standard. Under this framework, a plaintiff must establish that: (1) the detainee had a particular vulnerability to suicide; (2) the custodial officer knew or should have known of that vulnerability; and (3) the officer acted with reckless indifference to the detainee's particular vulnerability. *Colburn II*, 946 F.2d at 1023 (quoting *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988) ("*Colburn I*")). A key distinction is that while *Farmer* employs a subjective knowledge test, the "particular vulnerability to suicide" line of cases, as clarified in *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), does not require a

purely subjective showing. *Id.* at 231. As *Palakovic* explains, "[i]t is not necessary for the custodian to have a subjective appreciation of the detainee's particular vulnerability . . . 'reckless or deliberate indifference to that risk' only demands 'something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide.'" (quoting *Woloszyn*, 396 F.3d at 320)). *Id.* Both standards impose a demanding standard for deliberate indifference and any tension between these parallel doctrines[3] is immaterial here because the record does not establish that the Officer Defendants were deliberately indifferent under either standard.

First, under *Farmer*, no reasonable jury could find that the Officer Defendants violated Mr. McMillian's rights because the record does not establish that they had actual, subjective knowledge of the risk of serious harm. Each of the three officers testified that they did not know Mr. McMillian, or did not know him well, before the incident. (*See* D.E. 251-8, 251-9, 251-10.) Officer Fernandez testified that he had no prior interaction with Mr. McMillian before January 2, 2020. (D.E. 251-8 at 2.) Officer Munoz testified that he did not recall anything particular about Mr. McMillian or his behavior, other than that he was frequently housed in AdSeg. (D.E. 251-9 at 2–3.) Officer Sambour likewise testified that he did not know Mr. McMillian was mentally ill and recalled only that he moved in and out of AdSeg. (D.E. 251-10 at 2–3.) Although Officer Munoz testified that a "Special Needs Inmates" list was kept at the officers' desk, the record does not establish that Mr. McMillian's name appeared on that list, and even if it did, that fact alone does not establish that the officers subjectively appreciated the extent of his mental health needs or any heighted risk of suicide. (D.E. 267-6 at 26–27.) Accordingly, a reasonable jury could not

[3] The two approaches address related but slightly different inquiries. *Farmer* concerns deliberate indifference to the risk of serious harm generally and is not limited to suicide claims. The "particular vulnerability to suicide" framework is tailored to prison suicide cases and focuses on whether the detainee had a specific, heightened vulnerability to suicide and whether officials were recklessly indifferent to that vulnerability.

find deliberate indifference under *Farmer*, and the Officer Defendants are entitled to qualified immunity.

The same conclusion follows under the "particular vulnerability to suicide" framework. The first two prongs are satisfied: Mr. McMillian had a particular vulnerability to suicide and the officers should have known of that vulnerability. Mr. McMillian had been diagnosed with Paranoid Personality Disorder, a condition that can increase vulnerability to self-harm, and he had been prescribed multiple medications for his mental health. (Compl. ¶¶ 32–33.) In the years preceding his death, he was placed on constant or suicide watch at least six times after reporting suicidal ideation and auditory hallucinations. (*Id.* ¶¶ 14–19, 23.) Because this framework does not require proof that the officers subjectively appreciated Mr. McMillian's vulnerability, the officers' testimony that they did not actually know of Mr. McMillian's mental health history does not hold as much weight—given his documented history of suicidal ideation, psychiatric diagnosis identifying self-harm tendencies, and his frequent cycling in and out of the SU—the officers at least should have known of his particular vulnerability.

In assessing the third prong—whether the defendant acted with deliberate indifference to a prisoner's particular vulnerability to suicide—courts look to the definition developed in *Farmer*, which demands "something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Mullin*, 2019 WL 2315044, at *6 (quoting *Palakovic*, 854 F.3d at 231)). Courts often find deliberate indifference where an inmate has a known history of suicide attempts or suicidal ideation, and officials fail to take basic protective measures. *Id.* (finding deliberate indifference where the decedent told an officer he wanted to kill himself, and the officer ignored this plea and encouraged him to do so); *Hinton v. Mark*, 544 F. App'x 75, 77 (3d Cir. 2013) (finding deliberate indifference where an officer observed the decedent in clear distress but

declined to place him in a psychiatric observation cell because the cells were full and instead told him to "be cool" over the weekend); *Talley v. Griesmer*, No. 19-3796, 2023 WL 3002742, at *3 (3d Cir. Apr. 19, 2023) (finding deliberate indifference where the inmate stated he was suicidal and used a razor to self-harm, but officers—aware of the threats and injuries—left him unsupervised for more than an hour).

Here, however, a reasonable jury would be unlikely to find deliberate indifference because the record does not reflect a significant failure to take basic protective measures that rises above negligence. The record indicates that when Mr. McMillian expressed suicidal ideation or thoughts of self-harm, staff responded in a timely and appropriate manner by safeguarding him and placing him on constant or suicide watch or sending him to the SU. (Compl. ¶¶ 13–38.) Nor is there sufficient evidence that the officers failed to conduct mandatory rounds on the date in question or otherwise materially deviated from their routine monitoring practices. Even if there were sufficient evidence of a breach in the officers' monitoring practices, this claim would, at most, amount to negligence. Although Plaintiff contends that proper monitoring would have revealed Mr. McMillian preparing to harm himself, the record contains no evidence establishing that the officers materially neglected their monitoring duties. (*Id.* ¶¶ 44–48; D.E. 267 at 29–30.) Moreover, once alerted that Mr. McMillian was committing suicide, the Complaint itself reflects that the officers responded promptly to his cell. (Compl. ¶ 49.) On this record—considering the officers' testimony and course of action —a reasonable jury could not find deliberate indifference by the Officer Defendants. Accordingly, Plaintiff has failed to show a violation of a clearly established right, and qualified immunity applies to the § 1982 claim against the Officer Defendants.

c. The NJCRA Mirrors the Federal Qualified Immunity Standard

New Jersey's analogue to § 1983—the New Jersey Civil Rights Act ("NJCRA")—authorizes suits against a person acting under color of law for civil rights violations under state or federal law. N.J. Stat. Ann. § 10:6-2. Here, the Complaint alleges that Defendants violated Article 1, Clause 12 of the New Jersey Constitution, the state analogue to the Eighth Amendment. (Compl. ¶¶ 62–69.) New Jersey's qualified immunity doctrine mirrors the federal standard, shielding public officials from liability unless they are plainly incompetent or knowingly violate the law. *Brown v. State*, 165 A.3d 735, 743 (N.J. 2017) (quoting *Morillo v. Torres*, 117 A.3d 1206, 1215 (N.J. 2015)). Because Article 1, Clause 12 tracks the Eighth Amendment and NJCRA claims are analyzed under the same framework as § 1983 claims, Officer Defendants are likewise entitled to qualified immunity as to Count II. *Harris v. City of Newark*, 271 A.3d 1250, 1257 (N.J. 2022).

ii. Count III: Medical Malpractice/Medical Negligence Claim[4]

Plaintiff's Count III asserts a medical malpractice claim against the State Defendants[5] on the theory that "the medical defendants failed to provide decedent with mental health care that met the standard of care." (Compl. ¶ 72.) To the extent that Plaintiff still intended to assert this claim against the State Defendants, Count III must be dismissed because the pleadings do not allege that any State Defendant committed medical malpractice. (*See id.* ¶¶ 70–75.) The officers are not licensed medical professionals, and under New Jersey law, medical malpractice is a claim against

---

[4] State Defendants argue that the medical malpractice claim is barred because Plaintiff has failed to comply with New Jersey's Affidavit of Merit Statute ("AOM Statute")—the same basis on which this Court granted summary judgment to the Medical Defendants on Counts III and IV in July 2023. However, recent Supreme Court authority, holding that Delaware's AOM Statute conflicts with Rule 8 and therefore does not apply in federal courts, has called into question whether New Jersey's AOM Statute is likewise inapplicable. *Berk v. Choy*, 607 U.S. 187, 198 (2026); *Ryan v. Robinson*, No. 22-1175, 2026 WL 555453, at *8 (D.N.J. Feb. 27, 2026) (recognizing the tension between *Berk* and New Jersey's AOM Statute but declining to decide whether the statute is similarly inapplicable). This Court need not resolve that issue here because the claim is dismissed on other grounds.

[5] On July 5, 2023, this Court dismissed Counts III and IV against the Medical Defendants. (D.E. 74.)

a licensed person. *See* N.J. Stat. Ann. § 2A:53A-26. Because correctional officers are not among the licensed professionals covered by the statute, they cannot be held liable for medical malpractice. Because the State is named on a vicarious liability theory, absent a viable medical malpractice claim against the officers, there is no basis for vicarious liability against the State. N.J. Stat. Ann. § 59:2-2b.

iii. Count IV: Negligence Claims

Count IV alleges that the Officer Defendants had a duty to monitor the prison to ensure Mr. McMillian's safety and that the officers' failure to do so prevented them from observing his preparatory steps toward suicide. (Compl. ¶¶ 76–84.) Plaintiff further alleges that, after learning of Mr. McMillian's ongoing suicide attempt, the officers negligently failed to respond promptly to prevent further harm. (*Id.* ¶ 82.) However, the negligence claim against State Defendants must also be dismissed because Plaintiff has offered no expert testimony on negligence and has presented no evidence that the officers breached any applicable standard of care.

Expert testimony is generally required in negligence actions when the applicable standard of care involves specialized knowledge beyond the ordinary knowledge and experience of lay jurors. *Davis v. Brickman Landscaping, Ltd.*, 98 A.3d 1173, 1179 (N.J. 2014) (quoting *Sanzari v. Rosenfeld*, 167 A.2d 625, 628 (N.J. 1961)); *Conforti v. Cnty. of Ocean*, 299 A.3d 747, 755 (N.J. 2023). To support Plaintiff's allegation that the officers breached a duty to monitor the prison, Plaintiff must present expert testimony establishing the standard for "proper" monitoring in a correctional facility—a highly specialized environment. *See Bornstein v. Monmouth Cnty. Sheriff's Off.*, 658 F. App'x 663, 670 (3d Cir. 2016) ("[W]ithout an expert, the jury would be left to speculate as to the propriety of the nurses' actions, actions they took while treating an aggressive man in a correctional facility—a unique setting.").

As to Plaintiff's allegation that the officers failed to respond promptly to the emergency, the only expert qualified to evaluate officer response to emergency situations, Defendants' expert, Correctional Police Lieutenant Christopher Antoniello, opined that in response to the Code 66 (attempted suicide) emergency, staff acted in a "professional, safe, and meticulous manner consistent with their training and procedures." (D.E. 247-5 at 2.) Without expert testimony to establish the applicable standards in a correctional facility—a specialized environment marked by competing institutional interests and rapidly evolving circumstances—a reasonable jury would be left to speculate about the adequacy of both the officers' monitoring and their responses. Accordingly, summary judgment is warranted as to all State Defendants on this claim, because conjecture and speculation do not create a genuine dispute of material fact. *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016).

Summary judgment is also appropriate as to the State of New Jersey because immunity under the NJTCA applies[6]. Under the NJTCA, a public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable. N.J. Stat. Ann. § 59:2-2b. As the State is named solely on a vicarious liability theory and there is no genuine

---

[6] The State Defendants assert that the officers are also immune from negligence claims under the NJTCA because federal qualified immunity triggers the NJTCA's good-faith immunity for public employees. (D.E. 251-4 at 39.) That is misleading. The doctrines are analytically distinct, and the Third Circuit has recognized that NJTCA immunity must be assessed independently, regardless of whether federal qualified immunity is granted or denied. *Ciardiello v. Sexton*, 390 F. App'x 193, 199 (3d Cir. 2010). Nor does NJTCA immunity neatly apply here. Although public employees are generally immune from liability arising from discretionary acts, that immunity does not cover negligence arising from purely administrative or ministerial duties. N.J. Stat. Ann. § 59:3-2. Here, Plaintiff's principal negligence theory is that the officers failed to properly monitor Mr. McMillian. (Compl. ¶ 76–83.) Prison monitoring falls within the bounds of a ministerial act that affords little, if any, discretion, placing this claim outside of NJTCA's good-faith immunity. *See Rosario v. City of Union City Police Dep't*, 131 F. App'x 785, 792 (3d Cir. 2005). Nevertheless, Plaintiff's negligence claims against the State Defendants fail because Plaintiff offers no expert testimony.

issue of material fact as to the officers' liability on the negligence claim, the State is immune from that claim.

B. Medical Defendants' MSJ

The only claims remaining against the Medical Defendants are Counts I and II, the § 1983 and NJCRA claims. (*See* D.E. 74.) Plaintiff raises a § 1983 claim alleging that the Medical Defendants knew Mr. McMillian required ongoing mental health treatment—including psychotropic medication and frequent psychological counseling—but were deliberately indifferent to his rights by failing to provide necessary care. (Compl. ¶¶ 57–58.) Plaintiff's NJCRA follows the same theory. (*Id.* ¶¶ 65–66.)

Failure to provide adequate medical care to prisoners can violate the Eighth Amendment violation if the plaintiff meets the demanding "deliberate indifference to serious medical needs" standard. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To state a claim for denial of adequate medical care under *Estelle*, a plaintiff must show: (1) an objectively serious medical condition; and (2) subjectively deliberate indifference to that condition. *Id.* at 106. Deliberate indifference requires reckless disregard of a substantial risk of serious harm and may be shown where officials intentionally deny or delay access to medical care or intentionally interfere with the treatment. *Id.* at 104–105; *Baumgardner v. Ebbert*, 535 F. App'x 72, 75 (3d Cir. 2013) (quoting *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009)).

While courts routinely recognize that a particular vulnerability to suicide can constitute a "serious medical need", Plaintiff's claims against the Medical Defendants are framed as a failure to provide Mr. McMillian with "needed treatment", rather than as a "failure to prevent suicide" theory. (Compl. ¶ 57–58.) This framing parallels the complaint in *Palakovic*, where the plaintiff initially pursued a more general claim under *Estelle* that officials were deliberately indifferent to

the decedent's serious need for mental healthcare, rather than a claim premised on the decedent's particular vulnerability to suicide. *Palakovic*, 854 F.3d at 227. Accordingly, this Court applies the *Estelle* framework to this issue.

Although correctional facilities have a duty to provide prisoners with adequate medical care, establishing deliberate indifference is often difficult when some treatment is provided, because prison officials and medical providers have broad discretion in diagnosis and treatment, and claims of mere negligence or medical malpractice do not amount to a constitutional violation. *Palakovic*, 854 F.3d at 227 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993); *Estelle*, 429 U.S. at 106)). Courts also give substantial deference to prison medical authorities' clinical judgments and generally decline to second guess the propriety or adequacy of a particular course of treatment. *Id.* at 228 (quoting *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).

Here, as an initial matter, Mr. McMillian's diagnosis of Paranoid Personality Disorder and other mental health symptoms—including suicidal ideation, auditory hallucinations, and paranoia—plainly constitute a serious medical need, and the parties do not dispute that point for the purposes of this MSJ. (D.E. 269 at 8.) Nonetheless, no reasonable jury could find that the Medical Defendants were deliberately indifferent to his condition because the record contains no evidence that they intentionally refused to provide treatment or prevented Mr. McMillian from receiving appropriate care.

Over the nearly five-year course of this litigation, Plaintiff's theory appears to have shifted through discovery and related proceedings. The Medical Defendants now address deliberate indifference allegations premised on an asserted misdiagnosis, the failure to place Mr. McMillian on a forced medication protocol ("FMP"), and an alleged abandonment of Mr. McMillian as a

patient. (*See* D.E. 248-1 at 19–31.) However, those theories are not pleaded in the Complaint, and it is unclear when they first emerged. At summary judgment, the complaint, not the statement of material facts or the parties' briefing, defines the scope of the claims. *Balanced Bridge Funding, LLC v. Mitnick L. Off., LLC*, No. 21-20512, 2024 WL 3949334, at *5 (D.N.J. Aug. 27, 2024). A plaintiff who develops new or additional theories during discovery but does not amend the complaint may not advance those theories at the summary judgment stage. *Ross v. Forster, Garbus & Garbus*, No. 19-0574, 2023 WL 2625060, at *6 (D.N.J. Mar. 24, 2023) (citing *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008)); *Custin v. Wirths*, 850 F. App'x 147, 152 n.4 (3d Cir. 2021) (holding that claims raised for the first time in a statement of material facts at summary judgment were not properly before the district court)). Although Rule 15(a)(2) permits amendment at this stage with the opposing party's written consent or the court's leave, Plaintiff has not sought to amend under Rule 15. Fed. R. Civ. P. 15(a)(2); *Balanced Bridge Funding, LLC*, 2024 WL 3949334, at *5. Even so, construing the Complaint liberally and in light of the complexity of this case, this Court will address Plaintiff's arguments in response to the Medical Defendants' MSJ.

i. Dr. Garcia

Plaintiff asserts several § 1983 allegations against Dr. Garcia, Mr. McMillian's psychiatrist at Northern State Prison. Plaintiff first contends that Dr. Garcia acted with deliberate indifference by misdiagnosing Mr. McMillian with PPD, which Plaintiff characterizes as a "clinically unsupportable" diagnosis. (D.E. 265 at 28.) Plaintiff's expert, Dr. John Casas ("Dr. Casas"), opines in his report that the Medical Defendants' conclusion that Mr. McMillian suffered from a personality disorder was incorrect under the DSM-5 criteria. (D.E. 265-9 at 5.) Dr. Casas further opines that aspects of Mr. McMillian's medical history—including poor hygiene, inappropriate

affect, auditory hallucinations, and grandiose delusions—are more consistent with a psychotic disorder such as Schizoaffective Disorder than with a personality disorder. (*Id.* at 5–6.)

However, it is well-established that so long as a physician exercises their professional judgment, their conduct does not violate an inmate's constitutional rights. *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). Here, Dr. Garcia's diagnosis of PPD does not amount to deliberate indifference because it was based on testing and professional judgment. When Dr. Garcia began treating Mr. McMillian in June 2018, Mr. McMillian had already been evaluated by multiple physicians and had been diagnosed with a personality disorder. (D.E. 248-2 ¶¶ 13–50.) Dr. Garcia performed a psychiatric assessment and concluded that Mr. McMillian did not exhibit symptoms of a thought disorder. (*Id.* ¶ 53.) Later, after Mr. McMillian reported hearing voices, Dr. Garcia again considered whether he was psychotic but in his medical judgment, concluded that PPD was the more appropriate diagnosis because Mr. McMillian did not present abnormal perceptions, thought disorder or delusions—hallmark features of a psychotic disorder. (*Id.* ¶ 79.) Dr. Garcia also noted that Mr. McMillian's paranoid reactions and odd behavior pointed to a personality disorder diagnosis. (*Id.* ¶ 84.)

Although Dr. Casas disagrees with Dr. Garcia's assessment, a disagreement over diagnosis or treatment does not establish a constitutional violation. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (quoting *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). Even if Dr. Garcia's diagnosis was ultimately incorrect, that would at most support a negligence or malpractice theory, which is insufficient to satisfy the demanding deliberate indifference standard. *See Anderson v. Snyder*, 187 F. App'x 217, 218 (3d Cir. 2006) (holding that an inmate's allegations of misdiagnosis, at most, states a claim for medical malpractice and does not establish a constitutional violation); *Jetter v. Beard*, 130 F. App'x 523,

526 (3d Cir. 2005). Accordingly, Dr. Garcia's diagnosis of PPD does not constitute deliberate indifference to a serious medical need and does not rise to the level of a constitutional violation.

Second, Plaintiff contends that Dr. Garcia "summarily" discontinued Mr. McMillian's psychiatric care after concluding that Mr. McMillian did not need the psychotropic medication Dr. Garcia had prescribed. (D.E. 265 at 26.) Plaintiff argues that Dr. Garcia stopped prescribing medication not as a treatment decision, but out of frustration and a desire to stop treating Mr. McMillian. (*Id.*) However, as discussed above, decisions regarding a patient's treatment plan are matters of professional judgment and without more, do not amount to a constitutional violation. *Palakovic*, 854 F.3d at 228.

The parties do not dispute that Dr. Garcia did not meet with Mr. McMillian in the two months preceding his death. (D.E. 265-6 at 19.) Dr. Garcia nevertheless testified that he continued to discuss Mr. McMillian's care with the mental health team after their last appointment, and the record contains no evidence that Mr. McMillian requested to see Dr. Garcia after October 2019. (*Id.*) Importantly, the record demonstrates that Dr. Garcia discontinued Abilify, the antipsychotic medication, only after Mr. McMillian became noncompliant, despite repeated efforts by Dr. Garcia to ensure compliance, including attempting to administer the medication himself. (D.E. 248-2 ¶ 137; D.E. 265-6 at 15.) Dr. Salem, a physician at NSP who covered the SU, also testified that when an inmate has been off psychiatric medication for four weeks, it is protocol that the psychiatrist stops seeing the inmate because the inmate is no longer receiving psychiatric medications. (D.E. 249 at 16–17.) Further, after Dr. Garcia stopped seeing him, Mr. McMillian was not "abandoned"—he continued to receive mental health services, including treatment from Dr. Presley, a psychologist. (D.E. 248-2 ¶¶ 143–145.)

On this record, Plaintiff's characterization that Dr. Garcia summarily dropped Mr. McMillian is not supported. Rather, the evidence shows Dr. Garcia continued treating Mr. McMillian until he stopped taking the prescribed medication, after which Dr. Garcia exercised professional judgment consistent with protocol to transition him out of psychiatric medication management. That conduct further does not demonstrate intentional denial of care or intentional interference with treatment, the lofty standard for deliberate indifference.

Lastly, Plaintiff contends that Dr. Garcia's failure to place Mr. McMillian on an FMP constitutes deliberate indifference. The record, however, reflects that Dr. Garcia exercised his professional judgment and determined that an FMP was not warranted because Mr. McMillian was self-aware and insightful, recognizing that he was paranoid. (D.E. 265-6 at 14.) Moreover, courts have recognized that forced medication is an intrusive measure with serious implications for an inmate's liberty interests and should be employed only as a last resort after less intrusive alternatives have been exhausted. *See Sell v. United States*, 539 U.S. 166, 181 (2003); *United States v. Moruzin*, 583 F. Supp. 2d 535, 550 (D.N.J. 2008).

ii. Dr. Presley

Plaintiff's primary allegations against Dr. Presley, Mr. McMillian's psychologist at NSP, center around Dr. Presley's meeting with Mr. McMillian on December 23, 2019, ten days before Mr. McMillian's death. (D.E. 265 at 29–30.) During that appointment, Dr. Presley documented impaired reality testing and loose associations. (D.E. 248-2 ¶ 155.) Although he noted that Mr. McMillian could speak coherently, Dr. Presley also observed irrational and paranoid thinking consistent with Mr. McMillian's PPD diagnosis and stated that he intended to consult Dr. Garcia regarding possible psychopharmacological intervention to help Mr. McMillian gain greater insight

into his thought processes. (*Id.*) Dr. Presley acknowledges that he did not follow up with Dr. Garcia. (D.E. 265-1 ¶¶ 203, 207; D.E. 265-5 at 25.)

Based on this record, Dr. Presley's failure to revisit the medication issue after observing a shift in Mr. McMillian's mental health at most sounds in negligence and does not meet the deliberate indifference standard, because there is no evidence that Dr. Presley acted with reckless disregard or that he intentionally denied, delayed, or interfered with his treatment. Although Plaintiff argues that issues such as the significance of Dr. Presley's Decembre 23 observations and whether his inaction was reckless should be left to a jury, there is no genuine dispute of material fact because nothing in Dr. Presley's course of treatment reflects intentional interference with Mr. McMillian's medical care or reckless disregard of a substantial risk of serious harm.

iii. Dr. Salem

Plaintiff's claims against Dr. Salem center around her "summary discharge" of Mr. McMillian from the SU on December 9, 2019. (D.E. 265 at 34.) Plaintiff contends that Dr. Salem discharged him after he had made threats of self-harm, before a suicide risk assessment was completed, and without ensuring adequate follow-up monitoring and care. (*Id.* at 32.) In support, Dr. Casas opines that returning Mr. McMillian to a cell with anchor points without a proper suicide risk assessment or appropriate safeguards departed from basic medical protocols. (D.E. 265-9 at 11.)

The record, however, reflects that on December 9, 2019, during her last meeting with Mr. McMillian, Dr. Salem assessed him as "clinically stable" and not exhibiting acute psychotic symptoms during his stay at the SU. (D.E. 249 at 15.) Dr. Salem further described him as coherent, self-advocating, and goal-oriented. (*Id.*) Moreover, between Dr. Salem's last meeting with Mr. McMillian and January 2, 2020, Mr. McMillian did not display symptoms warranting a return to

the SU, and no other provider determined that he was suicidal during that period. (D.E. 248-2 ¶¶ 152–161.) This case is analogous to *Alexander v. Monroe Cnty.*, 734 F. App'x 801 (3d Cir. 2018), where the Third Circuit found no deliberate indifference when a physician, exercising professional judgment, discharged an inmate from suicide watch after the inmate denied suicidal ideation while on watch and continued to do so for the following two months. *Id.* at 804–805. Accordingly, Dr. Salem's decision to discharge Mr. McMillian from suicide watch does not rise to the level of deliberate indifference.

Plaintiff also argues that Dr. Salem, and the mental health staff more broadly, were frustrated with Mr. McMillian's perceived manipulation of housing assignments, and that a reasonable jury could infer the discharge was motivated by frustration rather than medical judgment. (D.E. 265 at 34.) Even though Mr. McMillian was viewed by many as a difficult patient, the record does not support that Dr. Salem's discharge decision was punitive or non-medical. (*Id.* at 26.) To the contrary, her testimony reflects that Mr. McMillian was coherent and not expressing suicidal ideation, supporting that the discharge was based on her clinical assessment. (D.E. 249 at 10, 15.)

## IV. CONCLUSION

For the reasons set forth above, the Officer Defendants' and Medical Defendants' Motions for Summary Judgment (D.E. 248, 251) are **GRANTED**. An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc: José R. Almonte, U.S.M.J.
Parties